FILED
2022 Mar-25  AM 10:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| THADDEUS MYRICK, NICHOLAS D. BRADEN, JESSIE POPEE, AND KENNETH L. FOUNTAIN | } } } } } | |
| Plaintiffs, | } } | |
| v. | } } | Case No.: 2:19-cv-01728-MHH |
| CITY OF HOOVER, ALABAMA | } } } | |
| Defendant. | } } } } | |

## MEMORANDUM OPINION AND ORDER

This is an action for employment benefits under the Uniformed Services Employment and Reemployment Rights Act or USERRA. Plaintiffs Thaddaeus Myrick, Nicholas D. Braden, Jessie Popee, and Kenneth L. Fountain are police officers for the City of Hoover. They also serve in the United States armed forces as reserve officers. The officers contend that when they were called to military duty and took military leave from their jobs with the City, under USERRA, some of their employment benefits from the City should have accrued. The City of Hoover disagrees. The officers and the City of Hoover filed cross-motions for summary

judgment.  For the reasons discussed below, the Court grants the officers' summary judgment motion.

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  To demonstrate that a genuine dispute as to a material fact precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).  When considering a summary judgment motion, a district court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences from that evidence in favor of the non-moving party. *Sconiers v. Lockhart*, 946 F.3d 1256, 1260 (11th Cir. 2020).

"The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a

matter of law on the facts that are not disputed.  The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration." *Alabama Mun. Ins. Corp. v. Scottsdale Ins. Co.*, 297 F. Supp. 3d 1248, 1252 (N.D. Ala. 2017) (quoting *Southern Pilot Ins. Co. v. CECS, Inc.*, 52 F. Supp. 3d 1240, 1242-43 (N.D. Ga. 2014) (internal quotation marks omitted).   "Cross motions for summary judgment may be probative of the nonexistence of a factual dispute.  Indeed, when both parties proceed on the same legal theory and rely on the same material facts the court is signaled that the case is ripe for summary judgment." *Shook v. U.S.*, 713 F.2d 662, 665 (11th Cir. 1983) (internal citation omitted).

## SUMMARY JUDGMENT EVIDENCE

Officers Myrick, Braden, Popee, and Fountain work or previously worked as employees of the City of Hoover.  Officer Myrick worked for the City as a police officer from May 23, 2016, until December 15, 2018.  (Doc. 13-1, pp. 2-3).  During that time, Mr. Myrick also served as a member of the Alabama Army National Guard.  (Doc. 13-1, p. 5).  While he worked for the City, the National Guard ordered Officer Myrick into active duty.  The National Guard ordered Officer Myrick to appear for training from January 7 to March 4, 2017, and from March 18 to April 1, 2017.  (Doc. 13-1, pp. 6-7).  On June 22, 2017, the National Guard mobilized Officer Myrick for active-duty service in Operation Enduring Freedom – Spartan Shield.

(Doc. 13-1, pp. 8-10).  The National Guard released him from active duty on July 4, 2018.  (Doc. 13-1, p. 12).

Officer Braden has worked for the City since 2011.  (Doc. 13-2, p. 2).  Officer Braden also serves in the Alabama Army National Guard.  (Doc. 13-2, p. 2).  The National Guard called up Officer Braden from August 7 to December 7, 2011, for training; from June 22, 2017, to June 11, 2018, for active-duty service in Operation Enduring Freedom – Spartan Shield; and for additional training from August 5 to August 30, 2018.  (Doc. 13-2, pp. 3-7).

Officer Popee has worked as a jailer and police officer for the City of Hoover since 1994.  (Doc. 13-3, pp. 2-6).  During that time, he also served in the Alabama Air National Guard.  (Doc. 13-3, p. 7).  The National Guard called up Officer Popee from May 22 to June 9, 1999, for training; from October 1, 2001, to May 31, 2003, for active-duty service in Operation Enduring Freedom – Noble Eagle; from February 9, 2004, to December 31, 2005, to serve again in Operation Enduring Freedom – Noble Eagle; from July 1, 2008, to August 31, 2009, for active-duty service in the War on Terror; from August 2 to September 30, 2010, for training; and from April 21 to June 30, 2012 for training and reserve tour.  (Doc. 13-3, pp. 7-25).

Officer Fountain's employment with the City of Hoover similarly overlapped with his service in the armed forces.  (Doc. 13-4, pp. 2-3).  The Army Reserve

ordered Officer Fountain to active duty as part of Operation Enduring Freedom from January 28, 2007, to November 15, 2011.  (Doc. 13-4, pp. 3-4).[1]

The City of Hoover provides to its employees paid holidays and several types of leave.  (Doc. 13-6, pp. 2-15).  To qualify for these benefits, an employee must be in "paid status."  (Doc. 13-6, pp. 2-5, 8-9).  Employees are in paid status in a given pay period when they are on payroll or using paid leave during the pay period.  (Doc. 13-5, pp. 73, 78, 108, tpp. 72, 77, 107).

With respect to paid holidays, qualifying full-time employees receive eight hours of compensation for each of Hoover's 12 recognized holidays whether the employees work on those days or not.  (Doc. 13-6, p. 2).  To receive the paid holiday benefit, employees must be in paid status immediately before or immediately after a holiday.  (Doc. 13-6, p. 2).

Hoover offers its employees three types of leave that employees may convert to compensation:  annual leave, personal leave, and sick leave.  (Doc. 13-6, pp. 3-8).  The first type, annual leave, "is provided primarily for vacation purposes but may be used for any purpose by an eligible employee."  (Doc. 13-6, p. 3).  Annual leave accrues for eligible employees during each bi-weekly pay period.  (Doc. 13-6,

_____

[1] Monthly records of the plaintiffs' hours of military leave are available in Docs. 13-13 through 13-16.  Officer Fountain explained that he was in paid status for his initial period of active duty from January 28, 2007 until July 2007 because his deployment began locally, and he worked evenings for the Hoover Police Department with its Special Investigations Unit until he was sent out of state.  (Doc. 19-1, p. 2, ¶ 3).

p. 3). To accrue annual leave during a pay period, employees must be on paid status with the City at some point during the pay period. (Doc. 13-6, p. 3). "An employee may sell up to 40 hours of annual leave per calendar year if the employee's accrued leave balance exceeds 200 hours." (Doc. 13-6, p. 4). Annual leave accrued in excess of 500 hours may be converted to sick leave. (Doc. 13-6, p. 4). When "a non-probationary regular employee" stops working for Hoover, he or she "may be paid for accrued annual leave based on his or her current straight time hourly rate to a maximum of 500 hours." (Doc. 13-6, p. 4).

Personal leave works a bit differently. Employees may use personal leave at their discretion for any personal reason. (Doc. 13-6, p. 5). Full-time employees accrue 24 hours of paid personal leave on the anniversary of their hire date. (Doc. 13-6, p. 4). Employees who are converted to non-pay status for more than 30 days receive prorated personal leave. (Doc. 13-6, p. 4). Each year, employees may choose either to convert unused personal leave hours into annual leave or receive payment for unused personal leave. (Doc. 13-6, p. 5).

Sick leave is available to employees for absences for personal illness or injury, medical appointments, bereavement, or other similar circumstances. (Doc. 13-6, pp. 5-6). Employees accrue six hours of sick leave per month or three hours per pay period. (Doc. 13-6, p. 5). Like annual leave, sick leave accrues only if an employee is on paid status sometime during a pay period. (Doc. 13-6, p. 5). Unused sick leave

may be converted to retirement credit.  (Doc. 13-6, p. 7).  When an employee stops working for the City for a reason other than retirement, the employee "will be paid at the employee's current straight-time hourly rate for 50% of the balance of his or her sick-leave account, to a maximum of 320 hours . . . ."  (Doc 13-6, p. 8).

Beyond annual leave, personal leave, and sick leave, two other categories of leave are relevant to the officers' USERRA claims:  paid administrative leave and military leave.  The City may place employees on paid administrative leave.  (Doc. 13-6, pp. 9-11).  Paid administrative leave must be authorized by an employee's department head or administrator.  (Doc. 18-1, p. 2, ¶ 2).  Paid administrative leave covers absences caused by, for example, inclement weather, jury duty, voting, court hearings, and participation in job-related training.  (Doc. 13-5, pp. 80-81, tpp. 79-80; Doc. 13-6, pp. 9-10).  Paid administrative leave also is available when the City removes an employee from service during an internal investigation.  (Doc. 13-5, pp. 80-81, tpp. 79-80; Doc. 13-6, pp. 9-10).  Leave for inclement weather or hazardous travel conditions rarely lasts longer than a couple of days.  (Doc. 18-1, p. 3, ¶ 3). City employees who serve on a jury receive their regular pay, "including all leave accruals and holiday pay."  (Doc. 16-1, p. 5, ¶ 9).  The Mayor of Hoover must approve paid administrative leave that extends beyond 30 days.  (Doc. 13-6, p. 10).[2]

---

[2] The City of Hoover's policy regarding paid administrative leave provides:

Since 1994, at least three and perhaps as many as six employees of the Hoover Police Department have used paid administrative leave for 120 consecutive days or longer. One employee was on paid administrative leave from April 21, 1997, to May 31, 1998. (Doc. 13-8, p. 2). Another was on paid administrative leave from March 26, 1997, to November 15, 1998. (Doc. 13-8, p. 2). Another employee was on leave from July 30, 2012, to October 13, 2013. (Doc. 13-8, p. 2).[3] Since 1994, not

---

**Eligibility.**  All employees, except temporary and seasonal employees, may be authorized to take leave with pay by their Department Head or administrator for job-related training, inclement weather (as provided below), jury duty, voting, participating in City promotional examinations, attending a formal City hearing, participating as the subject of a City investigative review, attending court as a witness in cases not involving personal litigation, or other appropriate reasons as approved by either the Mayor, City Administrator, or Human Resources Director. Any fees paid to the employee may be retained by the employee in addition to the administrative leave pay.  The number of hours of leave granted for each day will not exceed the number of hours the employee is scheduled to work for that day. While on such leave, the Department Head, administrator, or the Mayor may require the employee to remain available during assigned working hours to report to work when called.  Administrative leave may only exceed 30 days with review and approval by the Mayor, and may be further evaluated at any time.

(Doc. 13-6, pp. 9-10) (emphasis in Doc. 13-6).

[3] Officer Fountain filed a declaration in which he stated that he is personally familiar with three Hoover law enforcement officers who the City placed on administrative leave while the City investigated allegations of misconduct concerning the officers.  He indicated that he does not know whether the three officers with whom he is familiar are the same three officers who the City of Hoover identified by number rather than by name in discovery responses.  (Doc. 19-1, pp. 2-3, ¶¶ 5-9; *see* Doc. 13-8, pp. 2-3, 5-13).  Officer Fountain offered to provide the names of the officers whose administrative leaves he discussed in his declaration. (Doc. 19-1, p. 2, ¶ 5).  In its discovery responses, the City of Hoover refused to provide the reasons for three paid administrative leaves of more than 120 consecutive days, (Doc. 13-8, pp. 2-3), but in one of its summary judgment briefs, the City acknowledged that the three police officers were placed on administrative leave during internal investigations, (Doc. 24, p. 3).

The City filed a motion to strike Officer Fountain's declaration as it pertains to the three officers who he says he knows the City placed on administrative leave during internal investigations.  (Doc.

counting the three paid administrative leaves of more than 120 consecutive days and brief weather-related periods of paid administrative leave, police department employees have used 55 periods of paid administrative leave that have lasted, on average, 104 hours or 13 eight-hour days.  (Doc. 18-1, p. 4, ¶ 6).

When employees are on paid administrative leave, they remain in paid status; are paid each pay period as if working; and earn annual leave, personal leave, sick leave, and holiday pay.  (Doc. 13-5, pp. 66-67, tpp. 65-66; Doc. 13-6, p. 10). Employees on paid administrative leave may be called into work during working hours.  (Doc. 13-6, p. 10).

Employees who serve in the military may request military leave.  (Doc. 13-5, pp. 84-85, tpp. 83-84; Doc. 13-6, pp. 13-15).  Employees on military leave are paid their salary for up to 168 hours per calendar year for a maximum of 21 eight-hour

---

23, pp. 3-7).  The City argues that Officer Fountain's statement that he is personally familiar with the situations involving the three officers equates to "office gossip or water-cooler conversations" because Officer Fountain did not explain how he would be in a position to have personal knowledge regarding the other officers' paid administrative leaves.  (Doc. 23, p. 4).

The Court has treated the motion to strike as an objection to the plaintiffs' summary judgment evidence.  (Docs. 23, 27).  The Court overrules the City's objection.  Officer Fountain attested that the information he provided concerning the three officers was based on personal knowledge, (Doc. 19-1, p. 1, ¶ 1), and he offered to provide additional details upon request.  The City chose to move to strike the declaration rather than request an opportunity to explore Officer Fountain's assertions, and the information that Officer Fountain provided is consistent with information that the City conceded in one of its summary judgment briefs.  The City's objection is not well-taken.

The plaintiffs also submitted a screenshot of a *Selma Times-Journal* article archived on newspapers.com.  (Doc. 19-2).  The Court has not considered the screenshot of the newspaper article because it is inadmissible hearsay. FED. R. EVID. 801.

days per calendar year.  (Doc. 13-5, p. 85, tp. 84; Doc. 13-6, pp. 13-14; Doc. 16-1, p. 5, ¶ 10).  While employees use their 168 hours of military leave, they remain in paid status.  (Doc. 13-5, pp. 109-10, tpp. 108-09).[4]  Thus, employees using their military leave benefit accrue other benefits while they use their 168 hours of paid leave.  (Doc. 13-5, pp. 109-10; tpp. 108-09).  Employees who must "serve active military duty on a full-time basis" must "request a leave of absence from City service."  (Doc. 13-6, p. 14).[5]

---

[4] The same is true when employees serving in the military choose to use other accumulated leave, such as annual leave.  (Doc. 13-5, pp. 109-10, tpp. 108-09).

[5] Hoover's policy regarding military leave provides:

> Authorization of military leave will be in accordance with applicable federal and state statutory requirements.  It is the intent of the City to comply with all legal requirements concerning military leave.  The terms and conditions of this policy are construed in accordance with state and federal law, and the intent of this policy is to neither restrict nor broaden statutory requirements related to military law.

> 1. **Entitlement.**  Eligible employees will be excused for military leave in accordance with Ala. Code § 31-2-13 and the federal Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. §§ 4301-4334.  City employees will be paid their regular salary for not more than 168 hours of military leave per calendar year.

> 2. **Request for Military Leave.**  An employee may use military leave upon proper notification and certification to the employee's immediate supervisor and Department Head or administrator.  Requesting employees must provide a copy of military orders, annual training or drill schedules, or other satisfactory documentation of attendance to Human Resources as soon as the employee receives such documentation.  Employees must also submit notice of any changes from the published training schedules in a timely manner.  If documentation is not received, deductions will be made from the employee's accrued leave, or will be considered without pay, for the undocumented period.  Once 168 hours of military leave is exhausted, the employee may request accrued annual leave or compensatory time as compensation for additional military leave.  If the employee elects to use accrued leave, any accrued leave

Hoover employees called to active military service may apply for military differential pay.  (Doc. 13-6, p. 14; Doc. 16-1, p. 6, ¶ 12).  Employees are eligible for this benefit if they are on active duty military leave for more than 30 days, and their military pay is lower than the pay they receive from Hoover.  (Doc. 16-1, p. 6, ¶ 12).[6]  To qualify for this benefit, an employee must provide documentation of military pay.  (Doc. 16-1, p. 6, ¶ 12).  Hoover remits military differential pay to an employee as a lump-sum "periodically, not each week or pay period."  (Doc. 16-1, p. 6, ¶ 12).  Under Hoover's policies, receipt of a lump-sum differential payment does not change an employee from unpaid status to paid status because the one-time payment is not tied to a particular pay period.  (Doc. 16-1, p. 6, ¶ 12).

At times during their employment with Hoover, when they were called to service in the armed forces, Officers Myrick, Braden, Popee, and Fountain exhausted

---

must be used continuously for any time period until either the leave is exhausted or the military duty period is completed.  If an employee elects not to use his or her accrued leave or exhausts all eligible accrued leave, remaining time on military duty will be in a non-pay status.

Employees who are required to serve active military duty on a full-time basis shall contact the Human Resources Department to request a leave of absence from City service.  A classified employee called into active military service in the armed forces of the United States during the war on terrorism, which commenced in September 2001, will be eligible for Military Differential Pay as established by the City.

(Doc. 13-6, pp. 13-14) (emphasis in Doc. 13-6).

[6] As mentioned in the previous footnote, the City of Hoover's written military leave policy states that Military Differential Pay is available for employees in active military service "during the war on terrorism, which commenced in September 2001."  (Doc. 13-6, p. 14).

their paid leave and entered non-pay status with Hoover so that their annual leave, personal leave, and sick leave stopped accruing.  The officers did not receive holiday pay when they entered non-pay status.  The officers argue that Hoover's treatment of them compared to employees on paid administrative leave, who accrue benefits throughout their paid leave, is an unlawful distinction under USERRA.  (Docs. 1, 14).

## ANALYSIS

Under USERRA, Congress has provided benefits "to working servicemembers" while servicemembers are away from their civilian jobs on military leave.  *Travers v. Federal Express Corp.*, 8 F.4th 198, 200-01 (3d Cir. 2021); *see also* 38 U.S.C. § 4301, *et seq*.  The statute provides that a person who is a member of a uniformed service "shall not be denied . . . any benefit of employment by an employer on the basis of that membership . . . performance of service . . . or obligation."  38 U.S.C. § 4311(a).  "[B]enefit of employment" covers "any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes . . . bonuses . . . [and] vacations . . . ."  38 U.S.C § 4303(2).

Under USSSERA, when employees are away from their civilian jobs because they are called to service in one of the nation's armed forces, the employees are

"deemed to be on furlough or leave of absence while performing such service."  38

U.S.C. § 4316(b)(1)(A).  While away from their civilian jobs, servicemembers are

"entitled to such other rights and benefits not determined by seniority as are

generally provided by the employer of the person to employees having similar

seniority, status, and pay who are on furlough or leave of absence under a contract,

agreement, policy, practice, or plan in effect at the commencement of such service

or established while such person performs such service."  38 U.S.C. § 4316(b)(1)(B);

*see* 20 C.F.R. § 1002.150(a).[7]

"The Department of Labor has promulgated final regulations, after notice and

comment, that implement USERRA."  *White v. United Airlines, Inc.*, 987 F.3d 616,

620 (7th Cir. 2021).  One of these regulations, 20 C.F.R. § 1002.150(b), is central to

the parties' summary judgment motions.  That regulation provides:

> If the non-seniority benefits to which employees on furlough or leave
> of absence are entitled vary according to the type of leave, the employee
> must be given the most favorable treatment accorded to any comparable
> form of leave when he or she performs service in the uniformed
> services.  In order to determine whether any two types of leave are
> comparable, the duration of the leave may be the most significant factor
> to compare.  For instance, a two-day funeral leave will not be
> "comparable" to an extended leave for service in the uniformed service.
> In addition to comparing the duration of the absences, other factors such

---

[7] "Entitlement to these non-seniority rights and benefits [as described in 38 U.S.C. § 4316(b)(1)(B)] is not dependent on how the employer characterizes the employee's status during a period of service."  20 C.F.R. § 1002.149.  For example, an employer's classification of an employee as "terminated" while he or she is on duty serving the United States "cannot be used to avoid USERRA's requirement that the employee be deemed on furlough or leave of absence, and therefore entitled to the non-seniority rights and benefits generally provided to employees on furlough or leave of absence."  20 C.F.R. § 1002.149.

as the purpose of the leave and the ability of the employee to choose
when to take the leave should also be considered.

20 C.F.R. § 1002.150(b); *see Moss v. United Airlines, Inc.*, 420 F. Supp. 3d 768

(N.D. Ill. 2019); *Hoefert v. American Airlines, Inc.*, 438 F. Supp. 3d 724 (N.D. Tex.

2020); and *Clarkson v. Alaska Airlines, Inc.*, NO. 2:19-CV-0005-TOR, 2021 WL

2080199 (E.D. Wash. May 24, 2021).[8]

The officers contend that USERRA dictates that while they are on military

leave, they should accumulate annual leave, personal leave, sick leave, and holiday

pay like colleagues who use administrative leave because the three categories of

---

[8] The officers contend that the Court should include in this list of cases the Third Circuit's decision
in *Travers v. Federal Express Corp.*, 8 F.4th 198 (3d Cir. 2021). The *Travers* case is not helpful
to an evidentiary analysis of comparable leaves under USSERA. In *Travers*, the Third Circuit
Court of Appeals reversed a district court's decision to dismiss a USSERA case based on the lower
court's finding that "paid leave was not a 'right and benefit' under USERRA." *Travers*, 8 F.4th at
199. Framing the issue before it, the Third Circuit explained: "[This] is a quarrel over whether
§ 4316(b)(1) allows Travers to allege that FedEx extends a right and benefit in the form of pay to
the group of employees who miss work for non-military reasons, but then denies pay to the group
absent for military service." *Travers*, 8 F.4th at 203. The Third Circuit held that Mr. Travers could
assert a USSERA claim based on that allegation: "FedEx allegedly pays employees for some leave
but declines to compensate Travers for leave taken to serve his country. That states a claim under
USERRA, a statute with a long history of protecting the jobs and accompanying benefits of
Americans called to our common defense. Best understood, USERRA does not allow employers
to treat servicemembers differently by paying employees for some kinds of leave while exempting
military service." *Travers*, 8 F.4th at 209. In reaching this conclusion, the Third Circuit stated:
"A second comparison is beyond this appeal: whether military leave taken by Group 1 is
comparable to the other types of leaves taken by Group 2. Travers alleges that his leave is
comparable to the jury duty, sick, or bereavement leave that FedEx provides to non-military
employees. Whether FedEx offers a type of leave comparable to military leave is for the District
Court to determine on remand. *See* 20 C.F.R. § 1002.150 (2021)." *Travers*, 8 F.4th at 203 n.10.
Thus, *Travers* does not inform this Court's analysis of comparable forms of leave on an evidentiary
record.

leave and holiday pay qualify as "benefits of employment" under 38 U.S.C. § 4303(2), and administrative leave and military leave are comparable.  (*See* Doc. 15, p. 16; Doc. 20, p. 1; Doc. 22, p. 1).  The City does not challenge the officers' characterization of the three categories of leave and holiday pay as "benefits of employment."  (*See* Doc. 17; Doc. 21; Doc. 24).  The officers argue that they are entitled to accrue these benefits while they are on military leave because the City provides the benefits "to employees having similar seniority, status, and pay who are on furlough or leave of absence."  *See* 38 U.S.C. § 4316(b)(1)(B); (Doc. 15, p. 16). If administrative leave and military leave are comparable under 20 C.F.R. § 1002.150(b), then the officers are entitled to accrue annual leave, personal leave, sick leave, and holiday pay while they are on military leave because, under the City of Hoover's policies, these benefits are available to employees on administrative leave.

Because "duration of the leave may be the most significant factor to compare" when determining whether "any two types of leave are comparable," 20 C.F.R. § 1002.150(b), we start there.  Citing the three Hoover Police Department employees who the City placed on administrative leave for 13 months, 15 months, and 20 months, respectively, the officers argue that administrative leave and military leave are comparable in duration.  (Doc. 22, p. 3).  The City contends that its employees typically use paid administrative leave for short-term purposes such as inclement

weather, training, or court appearances.  (Doc. 18-1, pp. 3-4, ¶¶ 3-4).  Among the plaintiffs, there are six military leaves longer than 120 days.  (Doc. 24, pp. 5-6).  The City asserts that, with three exceptions, paid administrative leave generally is far shorter than military leave, averaging 13 days.  (Doc. 18-1, p. 4, ¶ 6).

Courts that have examined the duration component of the comparable leave analysis under 20 C.F.R. § 1002.150(b) have focused on the typical or average lengths of the categories of leave that the parties compare.  *See Tully v. Department of Justice*, 481 F.3d 1367, 1370-71 (Fed. Cir. 2007) (“[T]he administrative judge separately relied on the difference between the typically brief duration of an absence for court duty and Mr. Tully’s two and half year absence for active service in the Army.  That factor reflects a significant difference in the character of the two forms of leave, and the administrative judge’s reliance on that factor was appropriate.”); *Huntsman v. Southwest Airlines Co.*, No. 19-cv-00083-PJH, 2021 WL 391300, at *5 (N.D. Cal. Feb. 3, 2021) (“But, plaintiff will still be able to compare the average duration of military leave to the average duration of other types of leave and that comparison will drive resolution of whether or not the types of leaves are comparable.”); *Clarkson*, 2021 WL 2080199 at *5 (comparing the longest periods of leave for bereavement leave, jury duty, and military leave and the average number of leave days for those types of leave).

The parties' evidence indicates that military leaves and administrative leaves from the Hoover Police Department are similar in that they typically last for short periods of time but may, occasionally, last one year or more. Absent active conflict, military leave typically is relatively brief for reserve duties like training and drills. Likewise, absent an internal investigation, administrative leave typically lasts a few days for inclement weather or trial attendance as a witness or for a slightly longer period for jury service.

Still, on average, short periods of military leave for training last longer than short periods of administrative leave. The City explained that, other than administrative leave for inclement weather and other forms of leave that do not exceed 35 hours, Hoover Police Department employees have used 55 periods of paid administrative leave that have lasted, on average, 13 eight-hour days. (Doc. 18-1, p. 4, ¶ 6). The plaintiffs' spans of military leave for training, on average, last nearly three times longer. Officer Myrick was called to training twice, first for approximately two months and later for approximately two weeks. (Doc. 13-1, pp. 6, 7). Officer Braden was called to duty for training once for approximately four months and again for approximately three weeks. (Doc. 13-2, pp. 3, 6). Officer Popee has been called to training three times for 18 days, two months, and 2.5 months respectively. (Doc. 13-3, pp. 8, 20, 24-25). Using five-day weeks and eight-hour days, the officers used an average of 37 eight-hour days of military leave for

training compared to the average of 13 eight-hour days for administrative leaves. On average then, military leave for training is almost three times longer than non-investigative administrative leave, not counting routine administrative leaves that last 35 hours or less.

The outliers in both categories of leave are, with one possible exception, comparable. The average length of paid administrative leave for officers removed from service for an investigation is 16 months. (Doc. 13-8, p. 2). The average deployed military leave generally is comparable. (Doc. 13-1, p. 12; Doc. 13-2, p. 5; Doc. 13-3, pp. 9, 10-14, 16-19; Doc. 13-4, p. 4).[9] The Court is not persuaded by the fact that the City has placed only three police officers on extended paid administrative leave over the past few decades. That number easily could double or triple if several officers were accused of joint or related misconduct. Multi-officer investigations are not routine, but they are not rare either. The City quickly could find itself in a position in which it had as many police officers on extended administrative leave as on deployed military leave. After all, the record suggests

---

[9] While an average of 16-months' administrative leave for internal investigation matches the average active-duty military leaves taken by Officers Myrick, Braden, and Popee ((12.4 months + 11.63 months + 20 months + 22.72 months + 14 months)/5) – it is not clear how Officer Fountain's total military leave of 57.63 months fits into the picture. The evidence does not make clear whether the Court should regard Officer Fountain's military leave as a single term of active duty of nearly five years or as an initial one-year tour of active duty extended annually. (Doc. 19-1, pp. 3-4, ¶ 10). The latter scenario would align Officer Fountain's active-duty military leave with the active-duty military leave of officers who served several tours of active duty, separated in time by returns to civilian work.

that only four officers over the same time span have used military leave.  Still, setting aside the outliers relating to extended active-duty military leave and extended investigative paid administrative leave (which, again, are comparable in duration), the duration of the average paid administrative leave compared to the duration of the average military leave in the Hoover Police Department favors the City in a USERRA comparable leave analysis because a 3:1 ratio is significant.

Turning to the purpose of leave, the City of Hoover contends that the purposes of military leave and paid administrative leave are different.  (Doc. 17, pp. 19-20; Doc. 24, p. 8).  The City places employees under investigation on paid administrative leave to comply with the requirements of due process.  (Doc. 18-1, p. 4, ¶ 5; Doc. 21, p. 12).  Unless and until an employee is found to have done something wrong, the City must allow an employee to remain in paid status; an unproven allegation cannot deprive an employee of compensation.  (Doc. 18-1, p. 4, ¶ 5; Doc. 21, p. 12). Paid administrative leave gives the City time to investigate allegations of misconduct by Hoover employees.[10]

---

[10] One district court has explained:

> Plaintiffs argue that military leave is comparable to the City's administrative paid leave and industrial accident leave, both of which provide for accrual of benefits. . . . [T]he City has submitted uncontroverted evidence explaining that the longer-term administrative leaves generally occur when an employee is being investigated for allegations of serious misconduct.  In such a situation, the employee is placed on administrative leave until the investigation is completed and a determination as to any potential discipline or termination is made.  Mr. Chase explains that, in accordance with the employee's due process rights, the City is

Military leave facilitates voluntary military service by City employees, including Hoover police officers, and ensures that police officers who volunteer to serve in the armed forces may return to their civilian positions or to comparable positions following active service if "the absence for military service did not exceed five years cumulatively." (Doc. 13-6, p. 15).

Though the reasons for most types of administrative leave are different from the reasons for military leave, the purpose of both leaves is the same; both enable an employer to meet its obligations under the law.[11] As the City points out, due process compels the City to provide paid administrative leave to police officers who the City places under investigation. Statutory law undergirds the City's military leave. The City's Personnel Policy and Procedure Manual states that the City authorizes military leave "in accordance with applicable federal and state statutory requirements. It is the intent of the City to comply with all legal requirements concerning military leave." (Doc. 13-6, p. 13). The policy continues: "Eligible employees will be excused for military leave in accordance with Ala. Code § 31-2-

---

prohibited from depriving the employee of his pay until the investigation is complete and a determination has been made.

*Elliott v. City of Anaheim*, No.: SACV 12-00736-CJC(MLGx), 2015 WL 13918896, at *4 (C.D. Cal. July 21, 2015) (internal record citations omitted).

[11] According to the Merriam-Webster Dictionary, "purpose" is "something set up as an object or end to be attained." MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/purpose (last visited March 24, 2022).

13 and the federal Uniformed Services Employment and Reemployment Rights Act (USERRA), 38 U.S.C. §§ 4301-4334." (Doc. 13-6, pp. 13-14). Relatedly, administrative leave for trial attendance allows employees to fulfill legal obligations attendant to trial or jury subpoenas.[12]

Administrative leave for inclement weather serves a different purpose; the leave keeps employees who use it safe from potential harm caused by hazardous conditions. (Doc. 13-6, p. 10). But military leave serves the same purpose as administrative leave for inclement weather; officers who use military leave to train for deployment or to serve our country in military conflicts keep City employees

---

[12] The Jury System Improvement Act is very similar to USSERA. That statute provides, in relevant part:

> **(a)** No employer shall discharge, threaten to discharge, intimidate, or coerce any permanent employee by reason of such employee's jury service, or the attendance or scheduled attendance in connection with such service, in any court of the United States.
>
> **(b)** . . .
>
> **(c)** Any individual who is reinstated to a position of employment in accordance with the provisions of this section shall be considered as having been on furlough or leave of absence during his period of jury service, shall be reinstated to his position of employment without loss of seniority, and shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such individual entered upon jury service.

28 U.S.C. § 1875.

safe from potential harm.  In the Third Circuit's words, reservists using military leave are "Americans called to our common defense." *Travers*, 8 F.4th at 209.

Therefore, the purposes of administrative leave and military leave are comparable, and the purpose factor favors the officers.

With respect to control, the City argues that officers using military leave have greater control over their schedules than employees using administrative leave.  The City contends that employees cannot control when they will be assigned to administrative leave because the employees are the subject of an internal investigation and that employees placed on paid administrative leave are subject to being called back into work at any time during normal working hours.  (Doc. 21, pp. 13-14).  The City's arguments are not persuasive.  As for the concept of choice, officers volunteer to participate in military reserve units, but officers who engage in misconduct also voluntarily place themselves in a position in which they will have to take administrative leave if their wrongdoing is discovered.[13]

Once the choice is made, an officer who has opted to be a member of a military reserve unit does not control his duty schedule, and an officer who has opted to engage in misconduct does not control when the HPD will place him on

_____

[13] To be sure, an officer on administrative leave may be exonerated of wrongdoing.  That is the very purpose of administrative leave for internal investigations, and exonerated officers have not voluntarily subjected themselves to administrative leave.  But jurors likely would infer that police departments do not conduct internal investigations of officers unless the departments receive credible reports of wrongdoing.

administrative leave so that the HPD may investigate allegations of misconduct.  As for the possibility of returning to work during leave, though officers cannot work for the HPD when they are deployed out of state, Officer Fountain has demonstrated that officers may continue to work for the HPD during a period of military leave for as long as their reserve assignment allows them to remain in the Hoover area.  (Doc. 19-1, p. 2, ¶ 3).  By policy, the City may instruct an officer on extended administrative leave to work during the leave despite an ongoing internal investigation, but jurors likely would infer that the City would not exercise the option for an officer placed on leave for suspicion of wrongdoing.  As a practical matter, officers called to military duty outside of Alabama and officers placed on administrative leave pending the outcome of an internal investigation are not available to work for the Hoover Police Department.

Other forms of administrative leave similarly are beyond the control of employees.  For example, employees have no control over when they are called to jury duty.  Once called to duty, employees must comply with the trial schedule set by a court.  The jury duty provision in the City's personnel policy recognizes this and excuses employees from work "for the day or days he or she is required to serve as a juror in any court" created by law.  (Doc. 13-6, p. 10).

In dicta in its recent decision in *White*, the Seventh Circuit Court of Appeals rejected the notion that military officers who volunteer for reserve service control their schedules.  The Seventh Circuit stated that the district court:

> rested its holding on the observation that, "[a]lthough both may be sporadic and uncontrollable in timing, all citizens ... are subject to jury duty ... whereas military duties ... are voluntarily joined." This logic both ignores the text of the regulation and impermissibly penalizes servicemembers for joining the military, in direct contravention of USERRA's core purpose. Comparability analysis is not affected by the fact that the service-member has voluntarily signed up for military service (and thus will be eligible for military leave at some point). For almost 50 years now, the United States has had an all-volunteer force. Instead, what matters is an employee's control over the *timing* of her leave of absence—*i.e.*, whether she has the option to choose *when* to take a given stretch of leave.

*White*, 987 F.3d at 625 (emphasis in *White*).  The Court adopts this persuasive reasoning.[14]  The control factor weighs in favor of the officers.

In sum, the purpose and control factors favor the officers, and the duration factor favors the City.  The duration factor typically is more significant than the purpose and control factors, but here, the duration of average military leave and average administrative leave is not so different that the duration factor must drive the Court's analysis.  The temporal outliers – active-duty military leave and paid administrative leave for internal investigations – generally are comparable in

---

[14] In *Clarkson v. Alaska Airlines, Inc.*, NO. 2:19-CV-0005-TOR, 2021 WL 2080199 (E.D. Wash. May 24, 2021), the district court indicated that individuals in the plaintiff's military position could "work with their military unit scheduler to accommodate scheduling preferences, to a certain degree." *Clarkson*, 2021 WL 2080199, at *8.  There is no such evidence in the record in this case.

duration.[15]   Considered together, the regulatory factors indicate that the City's administrative leave and its military leave are comparable in purpose and control and minimally comparable in duration, with average military leave for training lasting three times longer than an average administrative leave.  Consequently, when an officer in the Hoover Police Department "performs service in the uniformed services," the City must provide to the officer the "most favorable treatment accorded to" Hoover employees who use administrative leave.   20 C.F.R. § 1002.150(b).[16]

---

[15] Notably, the record reflects that none of the plaintiff officers has participated in active military duty since July of 2018.  The United States began Operation Enduring Freedom in Afghanistan in October 2001 in response to the September 11, 2001 terrorist attacks in the United States.  The United States completed its withdrawal from Afghanistan in August of 2021.  THE U.S. WAR IN AFGHANISTAN, https://www.cfr.org/timeline/us-war-afghanistan (last visited March 24, 2022). Therefore, absent a new military conflict, going forward, no officer is likely to have to request military leave for active duty.

[16] In dicta in *White*, the Third Circuit remarked:

> USERRA mandates only equality of treatment; it does not specify how generous or how parsimonious an employer's paid leave policies must be. Amici and United argue that our interpretation would unsettle previous expectations and increase payroll burdens on small businesses, the airline industry, and state and local governments. They point out that many states and municipalities require employers to provide at least some leave for illness and jury duty, and other private employers do so voluntarily. Labor costs will increase, however, only to the extent that a few employees will be taking paid leave for one more purpose.

*White*, 987 F.3d at 624-25.  The reasoning applies equally here.

Absent active conflict, HPD officers will have only brief windows of unpaid military leave in which USSERA will operate to allow officers to collect benefits available to City employees using paid administrative leave.  As discussed, annually, the City provides paid military leave to its employees during the first 168 hours (21 days) of leave, and employees are in paid status during those hours for purposes of accumulated benefits.  (Doc. 13-5, pp. 109-10, tpp. 108-09).

## <u>CONCLUSION</u>

For the reasons discussed, the Court denies Hoover's summary judgment motion and grants the officers' motion.  By April 7, 2022, the parties shall confer and jointly indicate in writing whether they are able to stipulate to the terms of a final judgment.[17]

**DONE** and **ORDERED** this March 25, 2022.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

---

[17] As discussed above, the evidence regarding Officer Fountain's active-duty military leave is unclear.  In his declaration, Officer Fountain states:  "I was initially mobilized for one year's active service; but my activation order was subsequently extended for another year, and then another year, until I was finally discharged from active duty in November 2011."  (Doc. 19-1, pp. 3-4, ¶ 10).  Taken literally, Officer Fountain indicates that he served three successive one-year tours. But that conflicts with his Certificate of Release or Discharge from Active Duty form, which states that his tour lasted for nearly five years.  The parties should consider the details of Officer Fountain's active-duty military leave in their effort to jointly propose a final judgment.